******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PRESCOTT, J., dissenting. In this factually and legally complex action, brought by the plaintiff homeowner, David Crouzet, to recover for economic harm resulting from groundwater and soil contamination on his property that allegedly migrated from an adjoining property owned by the defendants, two churches,[1] the trial court heard competing expert and scientific testimony from numerous witnesses over the course of a five day trial to the court. Various experts and historical fact witnesses testified regarding potential alternative or secondary sources of the pollution on the plaintiff's property. One hundred and thirty exhibits were admitted at trial.

Despite the complexity of this case, however, the trial court did not issue a written memorandum of decision setting forth its factual findings and its application of the law to those facts. Instead, the court rendered a short, oral ruling from the bench in favor of the defendants, the substance of which spans approximately one transcript page. The decision is devoid of any factual findings other than a brief, general comment on the credibility of certain expert testimony. It also contains no discussion of the applicable law.

Despite these obvious lacunae, the plaintiff, who has appealed from the court's judgment, filed a motion for articulation that was quite limited in scope. In response, the court's articulation was exceedingly brief and did little to explain the factual or legal basis for its judgment. If anything, the court's articulation further muddied the waters. Importantly, the plaintiff failed to file a motion for review with this court in order to remedy the reviewability issues engendered by the trial court's decision and articulation.

The meaning of the court's decision is not readily apparent to me. For the reasons I subsequently will set forth, a possible interpretation of the court's decision is simply that the plaintiff failed to meet his burden of persuasion on the critical issue of whether the environmental contamination of his property was caused by the defendants. Because our well settled standard of review requires me, under these circumstances, to construe the court's judgment in a manner to uphold it, rather than to undermine it; see *White* v. *Latimer Point Condominium Assn., Inc.*, 191 Conn. App. 767, 780–81, 216 A.3d 830 (2019); I respectfully dissent from the decision of the majority to reverse the judgment and remand the case for a new trial.

I begin with the facts and procedural history of the case. The majority opinion more than adequately describes the evidence that was presented at trial and I see no need to repeat it wholesale here. It bears emphasis, however, that we know little regarding what facts

the trial court concluded had been established by this evidence.

With respect to the procedural history, I first turn to the court's oral decision rendered immediately at the conclusion of closing arguments. After briefly discussing the disposition of some outstanding motions and the content of the closing arguments, the court's entire decision was as follows: "Both [Plato] Doundoulakis [the defendants' expert] and [Martin] Brogie [the plaintiff's expert] . . . were both such partisan advocates—now, this court has had experience with many experts who, no matter how partisan they may be, at least manage to project a veneer of impartiality. So the court intends to disregard both the testimony of . . . Doundoulakis and the testimony of . . Brogie, and the testimony of [William] Puckett [the plaintiff's contractor], which the court expressly rejects. That leaves— the only credible witnesses are [William] Warzecha [a state environmental analyst called by the plaintiff] and [Paul] Burgess [a licensed environmental consultant called by the defendants]. While . . . Warzecha was credible, his data was outdated and outweighed by . . . Burgess' testimony, but even that does not overcome the fact that the defense has shown a secondary source exists beneath the basement property owned by the plaintiff, and therefore finds *the plaintiff has failed to prove the allegations that defendant has caused the pollution beneath his house.*

"It is therefore unnecessary to reach the defendant's special defenses. Judgment will enter for defendants— defendant on all counts." (Emphasis added.)

The plaintiff filed this appeal on September 7, 2018. Shortly thereafter, on October 3, 2018, the plaintiff filed a motion for articulation. The sole question posed by the plaintiff in his motion was "[w]hat data of . . . Warzecha's was outdated?" The motion for articulation did not ask the court to articulate what facts it found with respect to its apparent conclusion that the plaintiff had failed to meet his burden of persuasion that the defendants were the cause of the environmental contamination on his property. It also did not seek any articulation from the trial court on its use of the phrase "secondary source."

The court granted "in part" the motion for articulation. It articulated as follows: "Nothing in the court's decision implicates either the statute of limitations or the continuing course of conduct doctrine. The court's reference to . . . Warzecha's testimony as 'outdated' was solely a reference to his credibility. Since he was taken out of turn with an [assistant attorney general] present who had filed an appearance moments before . . . Warzecha's testimony. Immediately after his testimony he and the [assistant attorney general] departed and they were not in the courtroom when evidence was presented which the court credited in finding that the

existing contamination beneath the plaintiff's property was there long before [the] plaintiff purchased his property."

The plaintiff did not file a motion for review, as was his right pursuant to Practice Book § 66-7, in which he could have asserted that the trial court's articulation was insufficient or otherwise improper. The plaintiff also did not seek any further articulation by the trial court after it issued its articulation. See Practice Book § 66-5. Moreover, the plaintiff took no steps, as was his right, to seek to compel the trial court to issue a memorandum of decision that complied with Practice Book § 64-1.[2] That provision obligates a trial court, under the circumstances presented here, to issue a decision, either orally or in writing, which "shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor." Practice Book § 64-1 (a).

On appeal, the plaintiff raises three claims of error, each of which makes reference to the trial court's use of the phrase "secondary source" in rendering judgment for the defendants.[3] In essence, the plaintiff argues that the court's use of the term "secondary source" either necessarily reflects unsound legal reasoning by the court that amounts to legal error or otherwise constitutes a clearly erroneous finding of fact because it is unsupported by any evidence in the record. I would conclude that the record before us simply is inadequate to support either of these arguments and to conclude otherwise would require us to engage in conjecture that our appellate courts consistently have eschewed in conducting appellate review of a judgment rendered following a trial to the court.

In order to review a claim of error, it is axiomatic that this court must have an adequate record, and it is the responsibility of the party seeking to overturn a decision to provide that record on appeal. See *Breen* v. *Judge*, 124 Conn. App. 147, 160–61, 4 A.3d 326 (2010). "It is well established that [a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification." Id., 161. "This court will neither speculate with regard to the rationale underlying the court's decision nor, in the absence of a record that demonstrates that error exists, presume that the court acted erroneously. . . . It is well settled that [we] do not presume error; *the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden [of] demonstrating the contrary.* . . . [If] the record can be read to support [a] court's conclusion that the plaintiff failed to meet his burden, the plaintiff has failed to demonstrate that the court erred." (Citations omitted; emphasis added; internal quotation marks omitted.) *White* v. *Latimer Point Condominium Assn., Inc.,*

supra, 191 Conn. App. 780–81. In other words, we must "read an ambiguous record, in the absence of a motion for articulation, to support rather than to undermine the judgment." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein,* 257 Conn. 570, 586 n. 29, 778 A.2d 885 (2001).

I first consider whether the court's use of the term "secondary source" *necessarily* reflects that the court's legal analysis was flawed. I am unconvinced.

It is undisputed that the plaintiff had the burden to prove that some or all of the pollution beneath his basement was caused by the defendants. The court appears to have explicitly concluded that "the plaintiff has failed to prove the allegations that the defendant caused the pollution beneath his house." The court, however, muddied the waters by stating that a "secondary source exists beneath the basement property owned by the plaintiff. . . ."

The court, however, never defined the term "secondary source." As the plaintiff indicates in his appellate brief, the "only definition of 'secondary source' was provided by [Burgess], which he defined as 'an *additional* source other than what was identified on the [defendants'] parsonage property.'"[4] (Emphasis added.) The court does not attempt to place its use of the term into any particular legal context by citing to or discussing any case law or legal doctrine involving secondary source contamination. The court also does not make any references to the parties' contractual agreement, which included a provision exempting the defendants from any obligation to remediate the impact of contamination coming from "secondary sources."

Importantly, the court expressly indicated that it was not reaching any special defenses raised by the defendants because the court determined that the plaintiff had failed "to prove the allegations that the defendant has caused the pollution beneath his house." The defendants had pleaded two special defenses in response to the operative complaint. The first special defense asserted that all causes of action alleged were barred by the relevant statutes of limitation. The second special defense pertained to the breach of contract counts and alleged that the defendants already had paid for all remediation work that was within the scope of the parties' remediation agreement. As previously stated, the parties had agreed that the defendants would not be responsible for any remediation that was attributable to a secondary source of contamination. Accordingly, the second special defense, if reached by the court, presumably would have required the court to consider reducing any damages awarded to the plaintiff if the court found that some of the contamination present beneath the plaintiff's basement was caused by both pollution from the defendants' property and from other sources. Because the court found that "the plaintiff has

failed to prove the allegation that the defendant caused the pollution beneath his house," there was no need for the court to attempt to apportion the responsibility between the defendants and other potential sources of the contamination.

Read in context then, the court's reference to a secondary or other source of the contamination arguably may have been intended to reflect that there was a factual reason for finding unpersuasive the evidence presented by the plaintiff relating to whether the defendants' property was the source of the contamination. Stated another way, the court's finding of the existence of an alternative or "secondary source" of the pollution simply may have informed its broader conclusion that the plaintiff had failed to persuade the court, as he must to prevail, that the defendants caused the pollution underneath the plaintiff's basement. Ultimately, I am left to conclude that, although the court uses the term "secondary source" in discussing the origins of the contamination found on the plaintiff's property, its use of that terminology is ambiguous, at best, given the lack of any relevant legal analysis or other context.

Importantly, in his motion for articulation directed at the trial court after the appeal was filed, the plaintiff never asked the court to explain its use of the term secondary source or its legal significance, to identify the nature of the secondary source or to explain whether its use of the term meant that the plaintiff had proven that the defendants' property was the primary or principal source of the contamination. Given the obvious ambiguities in the court's brief, oral ruling, it was incumbent on the plaintiff to seek clarification of the court's decision and, if the plaintiff believed that the court's articulation was insufficient, to seek review and relief from this court.[5] See Practice Book § 66-5.

Our rules of practice provide that a party will not ordinarily forfeit review of a claim solely on the basis of a failure to request an articulation and that this court has the authority to order an articulation sua sponte if necessary. See Practice Book § 61-10 and commentary. We are unable to do so in the present case, however, because Judge Koletsky has retired, and the issue of his use of the term "secondary source" is not one that is susceptible to clarification by another judge simply from a review of the record. It would be contrary to our standards of review and, frankly, unfair to the defendants, who were the parties that prevailed after a lengthy and undoubtedly expensive trial, to view the ambiguity of the court's decision through a lens that presumes error and results in the need for a new trial.[6]

I simply am unable to fairly determine whether the court used the term "secondary source" as a reference to some other alternative source of the contamination under the plaintiff's property or, as the plaintiff would have us conclude, as an implicit finding that the defen-

dants' property necessarily was also a source, if not the *primary* source, of the pollution, a finding, which in the plaintiff's view, would be inconsistent with the court's ultimate decision to render judgment in favor of the defendants.

Having determined that, due to the inherent and unexplained ambiguity in the court's imperfect decision, the record does not adequately support a conclusion that the court engaged in any clear legal error, I am left to consider only whether the trial court's use of the term "secondary source" necessarily reflects a clearly erroneous factual finding. To the extent that the court used that term merely to reflect that another source, other than the defendants' property, existed for the contamination on the plaintiff's property, I cannot conclude on this record that such a finding is clearly erroneous.

"In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Coppedge* v. *Travis*, 187 Conn. App. 528, 532–33, 202 A.3d 1116 (2019). "A finding of fact is clearly erroneous when there is *no* evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Emphasis added; internal quotation marks omitted.) Id.

In considering whether a court has made a clearly erroneous factual finding, we look to the evidence that was admitted at trial. Although, in so doing, we cannot consider evidence that the trial court expressly rejected as the finder of fact, we nonetheless will presume for purposes of our review that any evidence not discussed by the court was considered by it and credited in making any factual findings under review. Here, there was considerable testimonial and documentary evidence admitted that would have supported the court's finding that the contamination on the plaintiff's property came from a source other than the defendants' property.

Among the evidence before the trial court of other potential sources of oil contamination was testimony that a prior owner of the plaintiff's property regularly drained oil from his car onto the dirt driveway, allowing that oil to seep into the soil. In addition, a prior tenant living at the plaintiff's property testified at trial that on numerous occasions when the home's heating oil tank was being filled, oil would backflush out of the fill pipe "all over the ground." The plaintiff testified that the home inspection report that he received at the time he purchased his property stated that fuel oil had leaked from the home's fuel oil tank in the basement and that

the fuel oil line was improperly laid. There was also evidence that the contractor who later installed a concrete floor in the basement to replace the existing dirt floor pumped water contaminated with oil from the basement into the plaintiff's backyard. Furthermore, there was evidence that, even after a new heating system was installed, oil leaked from that new system and had been observed pooling on the floor of the plaintiff's basement. Finally, Burgess, whose expert testimony was credited by the court, gave testimony suggesting that he believed that the oil intruding into the plaintiff's basement had an origin other than the contamination on the defendants' property.[7] When asked if he "ever received data or information that suggested to [him] the existence of an alternative source of contamination at 50 Trumbull Avenue," he responded, "Yes."[8]

If I give the evidence presented the most favorable reasonable construction in support of the court's verdict as I must, I cannot conclude that the court's reference to a secondary source of contamination was a clearly erroneous factual finding. There was ample evidence in the record to support such a finding, regardless of its intended legal significance, and I am not convinced on this record that a mistake has been committed.

In summary, although the majority's construction of the court's decision, including the court's use of the term "secondary source," is plausible, I do not believe that it is the only explanation, or even the most likely, for the court's decision. Because we are compelled to resolve any inherent ambiguity in favor of upholding the court's judgment for the defendants, I would affirm the judgment of the trial court and, accordingly, respectfully dissent.

[1] The defendants are First Baptist Church of Stonington and Second Congregational Church of Stonington.

[2] Practice Book § 64-1, with limited exceptions not relevant here, requires that a trial court prepare a memorandum of decision whenever it renders an appealable final judgment, and provides in relevant part: "(a) . . . The court's decision shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor. If oral, the decision shall be recorded by a court reporter, and, if there is an appeal, the trial court shall create a memorandum of decision for use in the appeal by ordering a transcript of the portion of the proceedings in which it stated its oral decision. The transcript of the decision shall be signed by the trial judge and filed with the clerk of the trial court. . . .

"(b) If the trial judge fails to file a memorandum of decision or sign a transcript of the oral decision in any case covered by subsection (a), the appellant may file with the appellate clerk a notice that the decision has not been filed in compliance with subsection (a). . . . The appellate clerk shall promptly notify the trial judge of the filing of the appeal and the notice. The trial court shall thereafter comply with subsection (a)."

[3] The plaintiff's statement of the issues frames his claims as follows: "Did the trial court err in finding no liability against the defendants for contamination on the plaintiff's property when the defendants accepted responsibility for the pollution, which [the Department of Energy and Environmental Protection] concluded originated on the defendants' property, when no expert offered an opinion based on reasonable probability that there was a secondary source and no evidence established what the secondary source was? . . . Did the trial court err in finding no liability against the defendants when the existence of a secondary source does not relieve

the defendants of liability and when the defendants are the primary source of the contamination of the plaintiff's property? . . . Did the trial court err in considering the existence of a secondary source of contamination under [the Connecticut Environmental Policy Act, General Statutes § 22a-14 et seq.] and common-law claims of trespass and nuisance when no apportionment claim was brought by the defendants?"

[4] The fact that a witness defined the phrase in that manner does not necessarily mean that the court accepted it as the operative definition or intended to ascribe it that meaning when it used the term in its brief, oral decision. It is not simply the words themselves but the manner in which the court uses them, utterly disconnected from any true analysis or context, which renders the term ambiguous here.

[5] The majority suggests that no articulation was necessary because there was nothing "unclear or ambiguous in the court's brief explanation of its analysis." It would conclude that the court's use of the term secondary source can be readily discerned simply from the court having followed its secondary source reference with the statement that "*therefore* . . . the plaintiff has failed to prove the allegations that the defendant has caused the pollution beneath his house." I find this argument unpersuasive. In my view, the court may have been referring to an entirely alternative source of the contamination, fully excluding any contamination coming from the defendants' property. That interpretation finds support when read in conjunction with the court's subsequent articulation that "the existing contamination beneath the plaintiff's property was there long before [the] plaintiff purchased his property," referring to those oil discharges by previous owners or tenants of the plaintiff's property. Such a reading could be harmonized with the court's conclusion that the plaintiff had failed to meet his burden of persuasion with respect to proximate cause. Alternatively, the court's reference to another source could be read to mean a source in addition to or including the contamination from the defendants' property. That interpretation of the court's language, however, would result in a non sequitur because the mere existence of such an additional source would not "therefore" mean the plaintiff failed to show that the oil pollution from the defendants' property did not also cause some of the plaintiff's basement contamination and thus entitle the plaintiff to some recovery. I cannot resolve this conflict in favor of reversing the trial court without resorting to pure speculation or violating our duty not to presume error.

[6] The present case is readily distinguishable from our resolution of the appeal in *Zaniewski* v. *Zaniewski*, 190 Conn. App. 386, 210 A.39 620 (2019). In that case, we declined to apply a presumption of correctness to orders issued as part of a judgment of dissolution of marriage where the trial judge had failed to make factual findings underlying those orders. Unlike the present case, however, the trial judge in *Zaniewski* retired shortly after rendering the judgment on appeal, which prevented the appellant from obtaining an articulation of the court's decision. Id., 390–91. Here, the plaintiff had ample opportunity to seek and, in fact, obtained an articulation from the court. The plaintiff, however, failed to ask the court to articulate or otherwise remedy its failure to explain the factual and legal basis for its judgment, including its reference to a secondary source.

[7] Burgess gave the following testimony in response to direct examination by the defendants' counsel:

"Q. And what was it that . . . Brogie said to you in this phone conversation that led you to consider the possibility of an alternative contamination source for what was at 50 Trumbull Avenue?

"A. He indicated that he had received . . . —information from . . . Crouzet that a contractor was working in the basement and observed a purple oil flowing into the basement that looked fresh.

"Q. Did . . . Brogie share with you any other information about that purple oil—what part of the building or anything like that?

"A. I don't believe so at that time.

"Q. And what was significant to you about what . . . Brogie had said?

"A. Upon, you know, further research on that topic, it indicated that it would date the oil—the dyeing of oil took place around sometime after 1993, '94, when they started dyeing residential fuel oil. So that, that was a piece of information that sparked my interest at that time.

"Q. And why was the mention of purple oil suggestive to you of a secondary source or an alternative source of the contamination?

"A. Well, as the project developed, I—and we actually conducted the remediation on number 48 and 50 on the exterior part, I didn't observe any oil or any—also—nor oil that had that dye in it during the excavation.

"Q. And so if the area that you were working in between 48 and 50 didn't have any oil with that dye in it, what was the significance to you of a report of oil with that dye in it that was seen at 50?

"A. Well, it indicated the potential for a secondary source that could have occurred on the Crouzet property based on that observation and others—other facts."

[8] The plaintiff and the majority make much of the fact that Burgess' testimony regarding the possibility of other sources of the contamination under the plaintiff's property was not stated to a reasonable degree of certainty. The defendants, however, did not have the burden of proof with respect to causation. That burden fell on the plaintiff, and the court clearly concluded that he failed to meet his burden.

———————————————